UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| VARONIS SYSTEMS, INC., <br><br> Plaintiff, <br><br> -against- <br><br> GREGORY JARVIS, <br><br> Defendant. | Case No.: _____ <br><br> **DECLARATION OF GREGORY POMEROY** |

**Gregory Pomeroy**, declares pursuant to 28 U.S.C. § 1746 and subject to the penalty of perjury that the following is true and correct:

1. I am Vice President of North American Sales at Varonis Systems, Inc. ("Varonis" or "Company"), serving in this position since January 2019. I submit this declaration in support of Plaintiff's Order to Show Cause seeking a temporary restraining order, preliminary injunction, and expedited discovery. I have personal knowledge of the matters asserted in this declaration.

2. I have more than twenty years of information security and sales experience, many of which include sales management and leadership roles at Varonis where I have been employed in several capacities since 2008. I am responsible for driving revenue and leading sales operations in North America. As such, I am fully familiar with the functions Defendant Gregory Jarvis ("Jarvis") performed until his recent resignation on February 6, 2023, as well as the confidential and trade secret information that he had access to, and in-depth knowledge of, by virtue of his employment at Varonis.

**Jarvis's Work at Varonis**

3. As Vice President of North American Sales, I oversee Varonis's sales organization throughout the country, which included Defendant Gregory Jarvis in his capacity as Account

Manager (as well as his prior positions at the Company as Channel Manager and then Sales Manager – Channel East).

4. From the beginning of his employment until his resignation, Jarvis was intimately involved in and had knowledge of Varonis's relationships and transactions with clients and prospective clients and key business partners (i.e., third parties that market and/or sell Varonis's technologies and services), the Company's financial information and business strategies, and Varonis's products and products in development, including the marketing and sales strategies to place the Company's products.

5. As Channel Manager, from his hiring in July 2014 until July 2015, it was Jarvis's responsibility to identify and nurture partner relationships so that Varonis could use those connections to drive sales of the Company's products. The Channel Manager is responsible for driving and delivering sales leads and converting them into new business. The Channel Manager works as the primary source for developing partners and growing relationships and is responsible for educating Varonis partners and their sales teams on what Varonis has to offer and how to position Varonis products to the partners' clients.

6. Jarvis was promoted to the position of Sales Manager – Channel East, in which capacity he served from July 2015 until December 2019. In that role, Jarvis managed a team of channel managers for the northeast region of the United States and trained them to identify new business opportunities for Varonis and develop relationships with channel partners to obtain access to the partners' clientele and promote Varonis's products over the products of competitors. As Sales Manager – Channel East, Jarvis had access to partners all across the northeast region. Jarvis cultivated relationships with numerous Varonis partners, and being the channel regional manager,

Jarvis had access to the most senior stakeholders with partners and most strategic partners in the region.

7. In December 2019, Jarvis became an Account Manager, in which capacity he served until his resignation on February 6, 2023. As Account Manager, Jarvis assumed a client- and business partner-facing role as the Company's lead on sales initiatives, as well as a linchpin of Varonis's relationships with clients and business partners, which enabled Jarvis's access to and knowledge of the Company's confidential information.

8. Varonis is a pioneer in data security and analytics. Varonis focuses on protecting enterprise data: sensitive files and emails; confidential customer, patient, and employee data; financial records; strategic and product plans; and other intellectual property.

9. Varonis's data security platform -- which is provided both as on-prem solution, installed on clients' servers, and as a software as a service ("SaaS") solution, installed on Varonis servers -- detect cyber threats from both internal and external actors by analyzing data, account activity, and user behavior; prevents and limits disasters by locking down sensitive and stale data; and efficiently sustains a secure state with automation.

10. Varonis products address additional important use cases, including data protection, data governance, Zero Trust, compliance, data privacy, classification, and threat detection and response.

11. Varonis has customers spanning leading firms in the financial services, public, healthcare, industrial, insurance, energy and utilities, technology, consumer and retail, media and entertain, and education sectors.

12. The market for SaaS data security solutions is very competitive. To that end, Varonis acquired Polyrize in or around October 2020, which enabled Varonis to enhance its cyber

security product offerings for protecting clients' data stored in the cloud. AppOmni, is a relatively new entrant to the market of SaaS security management solutions, is a direct competitor to Varonis in this area.

13. As Account Manager, Jarvis has been integral in Varonis's efforts to penetrate the SaaS data security market and expand Varonis's share of the available market in which AppOmni is competing. In that position, Jarvis had access to and was intimately familiar with, among other things, Varonis's clients and prospective clients (including their deal terms, requirements, and timing for opportunities), its business arrangements with partners, business plans, costs and pricing strategies for Varonis's SaaS products, Varonis's products and products in development, and marketing and sales strategies to advance those products. We consider this information highly confidential, and we would never want a competitor to have this information, which would be immeasurably detrimental to Varonis.

14. To secure our confidential business information, Varonis invests in and deploys multiple means to manage, control, and restrict access to its systems. Varonis has layers of systems with complex permission systems that are each managed in a different way. The Company's security measures restrict the number of people and/or the people who should have access to particular aspects of the Company's business. Thus, for example, information may be restricted to relevant sales teams or by territories and hierarchies.

15. Jarvis had access to layers of these systems and knowledge of the confidential information stored in and/or protected by them to enable to him to advance Varonis's business. Jarvis also acquired knowledge of confidential information during the course of performing his duties and contributed to and/or was the source of some of the protected confidential business

information during his decade-long employment with Varonis (e.g., derived from leading deals or direct client/prospective client and partner relationships).

16. Jarvis cannot simply purge Varonis's confidential information from his head. It is implausible, for example, for Jarvis merely to block from his memory the price for a particular Varonis product or service a client paid when attempting to pitch and competitively price a similar competing AppOmni product to the same Varonis client faced with either renewing Varonis's product or service or selecting an alternative option -- particularly when Jarvis may have had years' long relationship with that client, which he was tasked with nurturing for Varonis's benefit, and may have been Varonis's sales lead on that expiring transaction. As such, Jarvis's employment with AppOmni essentially unlocks the gates for AppOmni to access or otherwise benefit from Varonis's confidential business information.

17. A critical function of Jarvis's role as Account Manager was to source new clients and business opportunities and maintain access to them. To that end, Jarvis built and cultivated relationships with numerous prospects and clients to promote sales to new clients, ensuring exiting clients renew their Varonis licenses and expand their Varonis portfolio to additional products (licenses).

18. Moreover, Jarvis continued to have access to and managed the relationships with the Company's channel partners, a significant source of business for Varonis's products. As such, one of Jarvis's paramount responsibilities was to establish and nurture Varonis's relationships with business partners so that they promote or prioritize Varonis's products over the products of Varonis's competitors, including AppOmni.

19. Channel partners are a significant source of potential clients for Varonis, as they provide the identities of or access to potential clients which Varonis might otherwise not have.

Channel partners at times have clients who are in the market for Varonis's products, or they have knowledge of potential clients who might be in the market for Varonis's products. In other words, a pool of business opportunities are available through channel partners who know what others want and they know who to target for Varonis's products -- and it was Jarvis's responsibility to develop and maintain relationships with channel partners, some of whom have their own brand value, and secure their imprimatur of Varonis's products.

20. Given the importance of channel partners to the marketing, sale, and placement of Varonis's products, Varonis devoted substantial resources into developing Jarvis's relationship, visibility, and reputation with channel partners.

21. Jarvis knows how we work to become a partner of choice with channel partners and/or the preferred purveyor of SaaS security management solutions for the partners' clients and potential clients identified by the partners. If AppOmni were to gain knowledge of and/or access to Varonis's relationships with channel partners and what potential client pools Varonis accesses through specific partners (as well as knowledge about their needs and preferences), this would place Varonis's SaaS business in jeopardy because Jarvis could leverage his years of relationships with Varonis's most strategic partners and most senior stakeholders at those partners -- facilitated by Varonis and at its expense for years -- to undermine the Company's products and to encourage them to prioritize or promote AppOmni over Varonis.

22. Besides identifying and maintaining the Company's access to potential clients (with the Company's resources), Jarvis also played a critical role in securing clients and cultivating client relationships. Inherent to this role, Jarvis acquired substantial knowledge of Varonis's clients' business needs and wants, as well as detailed and highly technical information about Varonis's

products and products in development and competitive strategies, the combination of which uniquely empowers Jarvis to damage Varonis's business.

23.	Varonis considers the identities of its customers (and deal terms with them), as well as prospective customers who may have an interest in or need for the Company's products and prospects that do not use or need, declined to use, or do not like Varonis's products or services, to be highly confidential.

24.	Varonis expended substantial efforts in aggregating and/or developing information about customers and prospective customers' particular needs and preferences, and the misuse or disclosure of such information will damage Varonis and erode its position as one of the leaders in data security and analytics.

25.	By virtue of his position as Account Manager, Jarvis was deeply involved in the sale and development of security products customized for existing and prospective customers. Customers and prospective customers regularly disclosed sensitive, non-public information about their information systems and particular business needs. With that information, Jarvis and Varonis's sales engineers presented demonstrations of the Company's products tailored to address the customers' specific needs.

26.	As part of this sales process, and among his chief responsibilities as the lead on Varonis's deals, Jarvis educated customers about Varonis's capabilities and, as such, the Company relied on Jarvis's credibility and expertise in Jarvis's data security solutions. For that reason, Jarvis had access to and knowledge of highly technical information about Varonis's products and product pipeline, as well as the Company's business plans and strategies. This means that Jarvis had privileged access to detailed information about the capabilities of Varonis's products, as well as information about the limitation of Varonis's products, which information Jarvis can convey to

AppOmni, a Varonis competitor, to strengthen its products. This information is highly confidential and proprietary -- and restricted to select personnel within the Company, including Jarvis.

27. In addition to Jarvis's knowledge of the strengths and witnesses of Varonis products, Jarvis directly received, had knowledge of, access to information about functionalities clients and prospective clients need, the degree to which they are satisfied with Varonis's products in servicing their needs, and scope of the clients and prospective clients' needs that Varonis' products and the products of its competitors are able to service.

28. On top of securing new clients during the sales process, Jarvis was responsible for maintaining and cultivating client relationships, including learning about clients and prospective clients' ongoing and anticipated future needs and requests for product features. Jarvis acted as the liaison between Varonis and its customers and the channel through which Varonis learned about clients' feedback about the Company's products, technical issues reported by clients, and product features that clients did not use or wanted and/or would need but did not have. Jarvis relayed this information, channeled to Varonis's engineering and/or technical team, to resolve issues identified by customers as well as strategize and identify functionalities to test, shelve, or develop.

29. Due to Jarvis's role in securing and maintaining client relationships, so that he could address clients' business needs, Varonis educated Jarvis about the Company's near-term, immediate term, and long-term product roadmap. Through meetings and other updates, Jarvis was fully apprised of the Company's product pipeline to enable Jarvis to provide an estimate as to whether and when certain products and/or features would be deployed and strategize a response insofar as products or features were not in development.

30. At the time of his separation from employment, Jarvis had (and continues to have) knowledge of the Company's 12-month product roadmap, at the very least. The plans we

developed for rolling out and promoting Varonis's products remain in effect and are going forward, and the information is highly restricted to select members within the company.

31. Jarvis is also fully familiar with Varonis's clients' pricing sensitivities. In his capacity as sales lead in Varonis's transactions with prospective and existing customers, Jarvis acquired knowledge of the amounts Varonis's clients paid and/or were willing to pay for products or services.

32. Similarly, Jarvis accumulated almost a decades' worth of information concerning the Company's licensing and pricing strategies, including Varonis's costs and what Varonis would be willing to price certain products and features either to secure a new transaction or obtain a specific client's renewal of Varonis's products or services.

33. Indeed, equipped with this information, Jarvis had significant autonomy as the lead on Varonis's deals, to offer discounts on Varonis's products and was aware of the extent and the circumstances under which Varonis could and/or would offer discounts beyond Jarvis's authority.

34. In sum, uniquely situated as the nexus between Varonis and its clients and prospective clients and business partners, Jarvis has almost a decade's worth of knowledge of Varonis's highly restricted and confidential information – which, if accessed or used on behalf of its competitors, poses a grave commercial threat.

35. For example, Jarvis knows not only the identity of Varonis's customers but also when customers' contracts with Varonis are scheduled for renewal and what products those customers use. Jarvis also knows the identities of former customers who no longer use Varonis's products. As such, Jarvis is uniquely positioned to not only target specific Varonis customers but also when they specifically are available to be poached. Additionally, Jarvis has knowledge of what products those clients use and/or need, which enables Jarvis to pitch, on behalf of AppOmni,

9

prospective clients and/or offer deals tailored to the needs or preferences of prospective clients through the use of his knowledge acquired solely by virtue of his decade's long employment with Varonis.

36. Exacerbating our concern about the damage Varonis may suffer as a result of Jarvis's employment with AppOmni, Jarvis is able to use his knowledge about what functionalities Varonis's clients need, how and/or for what purpose clients use security features, and what capabilities those clients are expected to need as their businesses grow or mature, which he learned solely through his employment with Varonis, for the benefit of AppOmni, e.g., by advising AppOmni on what products to develop or features to design to improve upon existing products or fill an existing or anticipated competitive gap.

37. As the primary face of Varonis for many of the Company's clients and business partners, Jarvis is able to leverage his credibility as a former insider and exploit his knowledge about the purported shortcomings with Varonis's products to the advantage of AppOmni.

38. Coupled with Jarvis's wide-ranging knowledge about Varonis's clients and their needs and preferences, Jarvis's in depth, technical knowledge of the strengths and weaknesses of Varonis's products uniquely positions Jarvis to damage the Company's business and competitive advantage to an extent that cannot be measured or repaired. Jarvis can identify what Varonis's products can and cannot do and how Varonis positions itself against competitors, including AppOmni, as well as guide AppOmni on selling against Varonis and developing AppOmni's products to exploit Varonis's limitations.

39. Additionally, with access to Jarvis's knowledge of what Varonis's clients pay and/or are willing to pay, as well as Varonis's pricing strategies and discount structures, AppOmni

is able to advantageously price its products to Varonis's customers and prospective customers and undercut Varonis's existing business relationships.

40. Jarvis also has the ability to compound the damage he is causing or will cause Varonis by developing AppOmni's nascent sales teams and sales capabilities, in competition with Varonis, using training and confidential information he acquired from his employment at Varonis.

41. Varonis places immeasurable value in the information Jarvis has about the Company's clients, its products, and its strategies for securing deals and differentiating Varonis's products from other competitors. The disclosure of this information would result in an immeasurable loss of Varonis's business and market position.

**Jarvis's Employment at AppOmni and Violation of the Employment Agreement**

42. On February 6, 2023, Jarvis informed his direct manager, Jared Hale, Regional Sales Director, that he was resigning from his employment with Varonis.

43. When Mr. Hale asked Jarvis where he was going, Jarvis answered that he would be joining AppOmni in the position of Account Executive in approximately two weeks.

44. The functions of an Account Executive at AppOmni are similar to the functions of an Account Manager at Varonis.

45. Mr. Hale advised Jarvis that AppOmni is a competitor of Varonis.

46. At some point that same day after his conversation with Jarvis, Mr. Hale informed me and senior management about his plans to join AppOmni.

47. I was surprised to learn that Jarvis was moving to a direct competitor. Under those circumstances, Jarvis's continued access to highly confidential information, as well as relationships with Varonis clients and business partners (and strategic information about them), posed an unacceptable threat to Varonis's business.

48. Varonis invested substantial time and resources to secure placement of its product and cultivate goodwill and social capital with clients and partners, as well as to aggregate intelligence and convert those relationships into sales.

49. Given the threat posed by Jarvis's employment at a competitor, although Jarvis gave two weeks' notice, I decided to exit him immediately that day.

50. The next day, on February 7, 2023, Varonis emailed Jarvis a letter reminding him of his obligations under the Employment Agreement and requesting Jarvis's confirmation that he intends to honor his commitments by February 12, 2023.

51. Following his separation, Varonis sent Jarvis several communications but Jarvis to date has not replied to the Company's entreaties to either certify his compliance with the post-employment covenants or confirm that he will abstain from working for or providing services to AppOmni during the one-year restricted period.

**Danger to Varonis From Jarvis's Employment at AppOmni**

52. Jarvis's employment with AppOmni, in a capacity similar to his role at Varonis, places him in a position where he, by virtue of his position advocating AppOmni's products and services, will provide AppOmni assistance in competing with and undercutting Varonis and its SaaS data security products, with which Varonis competes directly.

53. Indeed, with his preceding decade of experience dedicated exclusively to the development, marketing, and sale of Varonis's data security products and solutions, there is little or no function Jarvis could perform for, or value he could bring to, AppOmni's sales operations other than helping AppOmni compete with Varonis. Given that Jarvis will occupy a similar position at AppOmni, his employment with AppOmni also places Jarvis in a position by which

12

Varonis's confidential information will inevitably be used for the benefit for or disclosed to AppOmni.

54. Unfortunately, Varonis's concern about Jarvis's judgment and/or loyalty is not a hypothetical exercise. Approximately three months before Jarvis's resignation, on November 9, 2022, at a company-sponsored client event, Jarvis erroneously informed a client that Varonis's current products did not have a certain capability -- and that Varonis purportedly did not have any intent to develop that capability. This comment was witnessed and overheard by me and Mr. Hale who later corrected and admonished Jarvis for the confidential breach.

55. At the outset, Jarvis's statement was absolutely incorrect, and he should have known the statement to be false. Moreover, the client had not asked about the product's purported limitations or about Varonis's plans to remedy the (nonexistent) limitation. Further, setting aside the inexplicable error, the statement reflected outrageous misjudgment by Jarvis who should have (easily) obtained confirmation *from other people contemporaneously in the room* to corroborate his (mis)statement that he uttered without any prompting.

56. The aforementioned incident is only one example of the many opportunities, while in AppOmni's employ, Jarvis has -- given his knowledge of and access to Varonis's clients and prospective clients and business partners -- to disclose, or make inaccurate statements reflecting, Varonis's confidential information that Jarvis knows only as a result of his employment with Varonis. It should go without saying that information about the purported limitations of Varonis's products can be used to sway customers to purchase, and business partners to sell or advocate, competitors' products. That same information may be used to inform Jarvis's new employer about a market opportunity to develop a capability to fill an alleged gap left by Varonis to attract Varonis's existing or prospective clients.

57. Jarvis has already demonstrated a penchant or willingness to breach his post-employment obligations to Varonis. He should not be allowed to continue in a position that will irreparably damages Varonis's good will, reputation, and business advantage.

58. Because of the relationships Jarvis developed, and the knowledge he has about Varonis's deal terms, with the Company's clients and business partners, Jarvis also knows the Company's costs and profit margins under the Company's current arrangements. Varonis would never want a competitor to know about its business relationships with clients or business partners or the terms of any agreements between Varonis and any client or business partner. A competitor's access or knowledge of such information would enable a competitor to undercut Varonis and obstruct its commercialization efforts and business relationships.

**Immediate Injunctive Relief is Necessary**

59. If Jarvis is allowed to proceed with or continue his employment with AppOmni, it will cause irreparable harm to Varonis. AppOmni's employment of Jarvis -- with access through him to information about Varonis's products and their strengths and weaknesses, clients and business partners, pricing strategies, and the Company's business plans -- poses an irremediable threat. Once disclosed or used on behalf of a competitor, such as AppOmni, the Company's confidential information cannot be recovered, and the competitor's knowledge of this information cannot be expunged.

60. Varonis did not consent to Jarvis's employment with a direct competitor to Varonis's business and products. Jarvis has wide-ranging knowledge of all aspects of Varonis's products, sales and marketing plans, customers and their product needs and deal pricing, business relationships, as well as other non-public information he had access to during his employment with Varonis.

61. Jarvis's employment with AppOmni, for the one year following his voluntary separation of employment from Varonis, will damage Varonis's business relationships and competitive advantage and cause losses to Varonis that cannot be measured or repaid with monetary damages.

62. Indeed, in signing the Employment Agreement, Jarvis acknowledged that he would irreparably harm the Company by breaching his post-employment non-disclosure, non-competition, non-solicitation, and non-interference obligations owed to Varonis.

63. Jarvis further acknowledged that his acceptance of the post-employment non-disclosure, non-competition, and non-solicitation obligations owed to Varonis were material to Varonis's decision to employ Jarvis, and Jarvis further acknowledged that the limited restrictions were reasonable given the importance and sensitivity of the information he acquired solely by virtue of his (decade's long) employment with Varonis.

64. For all of the reasons set forth in this declaration, it is imperative that a temporary restraining order and preliminary injunction be issued enjoining Jarvis from working for AppOmni until February 6, 2024, extended by any period of time in which Jarvis has or will be employed by AppOmnis, and requiring him to comply with all terms of the Employment Agreement.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: February 24, 2023
       Vienna, Virginia

_____
Gregory Pomeroy
(DocuSigned by: A8B5279F009047D...)

15